## In Re Anonymous No. 65 D.B. 85

Disciplinary Board Docket No. 65 D.B. 85.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

Pursuant to Pennsylvania Rule of Disciplinary Enforcement 208(d)(2)(iii), the disciplinary board of the Supreme Court of Pennsylvania submits its findings and recommendations to Your Honorable Court with respect to the above captioned petition for discipline.

### HISTORY OF PROCEEDINGS

On August 15, 1985, the office of disciplinary counsel filed its petition for discipline alleging professional misconduct against respondent, [ ]. The petition deals with seven distinct charges that respondent violated one or more of the following disciplinary rules:

DR 1-102(A)(4) (dealing with conduct involving dishonesty, fraud, deceit or misrepresentation), charges 2 and 3;

DR 1-102(A)(6) (dealing with conduct that adversely reflects on an attorney's fitness to practice law), charges 1, 2, 3, 4, 5, 6 and 7;

DR 2-101(A) (dealing with a lawyer engaging in, utilizing or allowing any form of advertising that is knowingly false, fraudulent or misleading), as that rule was amended by order of the Supreme Court of Pennsylvania on July 27, 1979, charges 2 and 3;

DR 2-102(A) (prohibiting a lawyer in private practice from practicing under a trade name or a name that is misleading as to the identity of the lawyer or lawyers practicing under such name), charge 3;

DR 6-101(A)(3) (dealing with neglect of a legal matter entrusted to him), charge 7;

DR 7-102(A)(1) (prohibiting a lawyer, in his representation of a client, from filing a suit, asserting a position, conducting a defense, delaying a trial or taking other action on behalf of his client when he knows or it is obvious that such action would serve merely to harass or maliciously injure another), charge 6;

DR 7-105(A) (prohibiting a lawyer from presenting, participating and presenting or threatening to present criminal charges solely to obtain an advantage in a civil matter), charge 4;

These matters were referred to hearing committee [ ] consisting of [ ]. The parties, through counsel, entered into a stipulation of facts on November 7, 1985. Depositions were taken of prosecution witnesses on November 8, 1985, in [ ], Pa. and November 9, 1985, in [ ], Pa. Hearings were held on January 9 and 10, 1986, following which a general finding of misconduct was made by the hearing committee. Thereafter, a further hearing on the issue of discipline to be imposed was held on

March 5, 1986. The report of the hearing committee was filed on July 9, 1986.

The hearing committee determined that respondent had committed numerous distinct violations of the disciplinary rules and recommended that respondent be suspended from the practice of law for a period of 18 months to commence on the date of the final Supreme Court order in this matter. On July 30, 1986, respondent filed exceptions to the report and recommendations of the hearing committee contending that the suspension should run for a period no longer than one year and run from the expiration date of respondent's earlier six-month suspension and not from the date of final action by the Supreme Court of Pennsylvania in this case. Although petitioner filed no exceptions, it did file a brief in opposition to the exception of respondent advocating that a three-year suspension be imposed retroactive to the expiration date of the March 1985, six-month suspension.

These matters came before the disciplinary board for adjudication on September 4, 1986.

## STATEMENT OF FACTS

Respondent, [   ], was born in 1945 and was admitted to the practice of law on October 30, 1972. He has maintained his principal office in [P], Pa. [Respondent] has conducted a statewide practice in which he has specialized in serving individuals seeking a low-cost divorce or a low-cost bankruptcy adjudication.

### Charge 1

In August or September 1981, the law firm of [A] & [respondent], in which respondent was a principal with [A], placed low-cost divorce advertisements

in [Q], Pennsylvania newspapers. Subsequently, an [Q] practitioner, [B], began advertising the same or similar services. Ultimately respondent's firm began offering a lower price than that offered by [B]. Respondent then contacted [B] and informed him that his firm's prices would be lowered as far as necessary to force [B] to discontinue his advertisements. During numerous telephone calls in the fall of 1981, respondent advised [B] that respondent and [A] controlled the divorce business in Pennsylvania and that any attempts by [B] to compete with them would be futile. Repeated calls were made between November 1981, and February 1982, which were replete with disparaging remarks, obscenities and threats. Respondent also engaged a picket to parade in front of [B's] office for period of several weeks.

Disciplinary counsel charged respondent with a violation of DR 1-102(A)(6) (dealing with conduct that adversely reflects upon an attorney's fitness to practice law) with respect to these allegations.

## Charge 2

Charge 2 also deals with adverse relations between respondent and lawyers competing or attempting to compete in the low-cost divorce business. In the spring of 1982, [C] and [D] began placing ads in various newspapers in [ ] Pennsylvania under the name of "The Law Store of [C]-[D]." In approximately March 1982, respondent telephoned [C] telling him that respondent did not want him to advertise divorces in newspapers in the [R] area, that respondent had a monopoly and respondent was not going to let anybody else advertise in competition with him. Respondent was belligerent in the conversation and advised [C] that respondent had sued a lawyer from [Q] and would do

the same thing to [C]. The telephone calls became more frequent and were ultimately received on a daily basis. The calls became threatening both directly and by innuendo. Ultimately, on or about April 30, 1982, respondent began advertising in the area under the name of The Law Store of [respondent]-[A] and ultimately The Law Store of [respondent] and [A] Inc.

With respect to the facts underlying charge 2, disciplinary counsel has charged respondent with violations of DR 1-102(A)(4) (dealing with conduct involving dishonesty, fraud, deceit or misrepresentation), DR 1-102(A)(6) (dealing with conduct that adversely reflects on an attorney's fitness to practice law), and DR 2-101(A) (dealing with a lawyer engaging in, utilizing or allowing any form of advertising that is knowingly misleading).

*Charge 3*

The facts underlying charge 3, again deal with respondent's relations with competing attorneys. [E], who maintained his practice of law in [F], Pa., advertised low-cost divorce services in publications in [R], [F] and [S] under the trade name of [F] Legal Clinic. In June 1982, respondent placed multiple ads for comparable divorce services in edtions of the [F] newspaper listing a local telephone number. [E] placed an ad in the same paper stating that unlike respondent, [E] was local. During this period of time, calls to respondent responding to his ad were automatically connected to his [P] office or to a [T] employee by remote call forwarding. On or about July 29, 1982, respondent telephoned [E] demanding that [E] change his advertisement which had indicated that respondent and his associates were not local attorneys. Shortly thereafter respondent again telephoned [E] demanding that [E] remove his ads

from the classified section asserting an exclusive right to advertise in the classified ads. A similar pattern of repeated calls, threats and innuendo followed. Subsequently, respondent applied for and was granted a certificate of incorporation under the name of [F] Legal Clinic Inc. Respondent then ran an ad in the [F] newspaper under the name indicating that it was the original and only. Upon being informed by [E] that the advertising of the trade name might be a violation of the disciplinary rules, respondent removed the ad from the [F] paper.

With respect to the facts of charge 3, disciplinary counsel charged respondent with violations of DR 1-102(A)(4) (dealing with conduct involving dishonesty, fraud, deceit or misrepresentation), DR 1-102(A)(6) (dealing with conduct that adversely reflects on an attorney's fitness to practice law), DR 2-101(A) (dealing with a lawyer engaging in, utilizing or allowing any form of advertising that is knowingly misleading) and DR 2-102(A) (prohibiting a lawyer in private practice from practicing under a trade name or a name that is misleading as to the identity of the lawyer or lawyers practicing under such name.

*Charge 4*

The facts underlying charge 4 relate to respondent's relations with opposing counsel while engaged in the representation of their respective clients in a domestic dispute. Following a court appearance, respondent, upon leaving the courtroom, said to opposing counsel, [G]: "Are you satisfied, slut?" [G] thereupon kicked respondent and he in turn kicked her. Ultimately peace was restored by a deputy sheriff. Soon thereafter respondent began threatening criminal prosecution, a civil suit, and charges before the disciplinary board. He demanded

that [G] pay him $1,000 and that mutual releases be exchanged in order for him to forego his contemplated actions. Comparable threats and disparaging remarks were repeated by respondent in subsequent conversations.

Disciplinary counsel charged respondent with violations of DR 1-102(A)(6) (dealing with conduct that adversely reflects on an attorney's fitness to practice law) and DR 7-105(A) (prohibiting a lawyer from presenting, participating in presenting, or threatening to present criminal charges solely to obtain an advantage in a civil matter).

### Charge 5

In approximately November 1981, respondent and his firm began representing Mr. and Mrs. [H] in a bankruptcy action. In or about August 1984, Mr. and Mrs. [H] filed a civil complaint against respondent and his former associate alleging legal malpractice. Upon being served with a copy of the complaint, respondent telephoned the [H] home and engaged in a litany of degrading and disgraceful assertions against Mrs. [H]. Thereafter, respondent telephoned Mr. [H] and made obscene and disparaging comments to Mr. [H] and defamed his wife and other members of his family.

With respect to these events, disciplinary counsel charged respondent with violations of DR 1-102(A)(6) (dealing with conduct that adversely reflects on an attorney's fitness to practice law).

### Charge 6

The facts of charge 6 again relate to relations between respondent and opposing counsel, this time, [I]. During the course of negotiations, respondent told [I] that she was a "smart ass," a "motor mouth," "reprehensible," "an idiot," and a "little girl." Respondent further told [I] that he was in a position to

give one of her clients, the [J] Assistance Agency, significant problems by requesting hearings in each case which would result in consequent delay and increased costs.

Disciplinary counsel charged respondent with violations of DR 1-102(A)(6) (dealing with conduct that adversely reflects on an attorney's fitness to practice law) and DR 7-102(A)(1) (prohibiting a lawyer, in his representation of a client, from filing a suit, asserting a position, conducting a defense, delaying a trial, or taking other action on behalf of his client when he knows or it is obvious that such action would serve merely to harass or maliciously injure another).

*Charge 7*

Charge 7 relates to respondent's dealings with a former client, [K] of [S], Pa. [K] had originally been represented by respondent's partner, [A]. Following the suspension of [A] from the practice of law, [K] agreed to permit respondent to take over her divorce case. Thereafter, on or about February 5, 1985, during the course of that representation, [K] registered a complaint and requested return of her file. She was told that her file had been closed and it would cost $150 to reopen the file. During the conversation, she was repeatedly assaulted with disparaging remarks. [K] then asked her mother, [L] to get on the phone and talk with respondent. The verbal aggression continued and became obscene. Similar conduct resulted when respondent was called by a friend of [K], on her behalf, seeking information on the status of the divorce action.

Disciplinary counsel charged respondent with violations of DR 1-102(A)(6) (dealing in conduct which adversely reflects upon an attorney's fitness

to practice law) and DR 6-101(A)(3) (dealing with neglect of a legal matter entrusted to him).

## DISCUSSION

The hearing committee concluded that respondent's advertising practices resulted in several specific instances of both false, deceitful and misleading advertising. In addition, the hearing committee concluded that respondent's conduct, both with counsel and clients, reflected adversely upon his fitness to practice law. The hearing committee also found that respondent had threatened criminal and disciplinary actions solely to obtain advantage in a civil matter. There is little if any dispute regarding respondent's conduct. The critical issue is the proper discipline to be imposed.

Our review of the record has convinced this board that the manner in which respondent has dealt with the public, clients and his brethren at the bar is disgraceful not only to himself but to the entire profession. His lack of fitness to practice law is readily apparent.

Respondent, however, counters with testimony of a mitigating nature. The testimony before the hearing committee indicated that respondent placed himself under the care of a psychiatrist, [M], M.D., in approximately September 1983. Dr. [M] testified on March 5, 1986, that respondent suffers from a personality disorder which he characterized as a "mixed" type. Dr. [M] testified that respondent remained voluntarily under his care for three years and that as of that time (March 1986) he was not yet stabilized and would require continuing treatment for an indefinite period of time. The personality disorder was further characterized by Dr. [M] as one which manifests itself in impulsive and aggressive behavior consistent with the conduct evident in this

record. It is noteworthy, however, that Dr. [M] acknowledged that respondent suffered from no mental disease or impairment other than the personality disorder he described. Furthermore, Dr. [M] found respondent had the capability of knowing that his actions were wrong and nevertheless failed to control his conduct. Dr. [M], although concluding that the incidents of unwarranted verbal aggression manifested by this record were consistent with the diagnosed personality disorder, he did not conclude that the activities were, in fact, the direct result of the diagnosed disorder.

In summary, this board is convinced that respondent knowingly committed numerous violations of the Code of Professional Responsibility which are serious and warrant a substantial suspension from the practice of law. Moreover, it is apparent that respondent is suffering from a disorder which requires ongoing treatment if he is ever to resume the active practice as a responsible member of the legal community.

In recommending a substantial suspension this board has considered the disciplinary record of respondent and the similarity of his offenses over the years which resulted in a public censure in May 1977, three informal admonitions in February 1982, August 1982, and May 1984, and a six-month suspension which was imposed by this court by order of February 28, 1985.

### FINDINGS OF FACT

The disciplinary board of the Supreme Court of Pennsylvania hereby adopts the following findings of fact including findings 2 through 44 of the hearing committee:

(1.a) Petitioner, whose principal office is located at 300 N. Second St., Harrisburg, Pa, is invested,

pursuant to rule 207 of the Pennsylvania Rules of Disciplinary Enforcement, with the power and the duty to investigate all matters involving alleged misconduct of attorneys admitted to practice law in the commonwealth of Pennsylvania and to prosecute all disciplinary proceedings brought in accordance with the various provisions of the aforesaid rules.

(b) Respondent, [   ], was born in 1945, admitted to practice law in Pennsylvania on October 30, 1972, and maintained his practice in [P], Pa.

(c) Respondent was suspended from the practice of law for a period of six months commencing in March 1985, as a result of proceedings at No. 79 DB 82 and has not been readmitted.

*Charge 1*

(2) In about August and September 1981, attorney [B] of [Q], Pa, began advertising no-fault divorce services in an [Q] newspaper.

(3) At this time and prior thereto, respondent's law firm, [respondent] and [A], also was advertising no-fault divorce services in the same newspaper.

(4) Subsequently, respondent changed his firm's advertisements and offered a lower price than was offered by [B].

(5) Both respondent and his partner, [A], telephoned [B] and informed him that they would lower their prices as far as necessary in order to force [B's] advertisements out of the newspaper.

(6) During September 1981, and through mid-October 1981, respondent frequently telephoned [B] advising him, inter alia:

(a) That he and [A] controlled the divorce business in Pennsylvania; and

(b) That any attempts by [B] to compete with [A] and [respondent] would be futile.

(7) Between November 1981, and about February 1982, respondent and his employees at his instigation made repeated harassing telephone calls to [B's] law office stating as follows:

(a) [B] was a "jerk" and would be a "laughing stock" in [Q],

(b) Respondent was "coming to [Q] to get him";

(c) Respondent was going to "put him out of business";

(d) [B] is "son of a bitch" and respondent was going to "bleed him";

(e) "Everything is set to go, this will be just like Exodus in the Bible, the Nine Plagues. Each punishment will be more severe. That's what you ([B]) are doing to yourself."

(8) Respondent caused a picket to parade outside [B's] law office sporadically for several weeks beginning about mid-October 1981, for the purpose of interfering with attorney [B's] law practice, causing [B's] staff fear and anxiety.

*Charge 2*

(9) About February 1982, [C] and [D] began placing classified ads for routine no-fault divorce services in various publications in [ ] Pa. under the name of "The Law Store of [C] — [D]."

(10) About March 1982, respondent telephoned [C] and told him that he did not want him advertising divorces in the classified pages of newspapers around the [R] area.

(11) Respondent informed [C] that he had a "monopoly," had "built up a following in the classified pages" and was "not going to let anybody else advertise in competition" with him.

(12) Respondent explained to [C] how he had "sued a lawyer from [Q]" and stated that he would do the same to [C].

(13) Approximately one week later, respondent began making repeated telephone calls on a daily basis to [C's] office which were interrupted only when [C] stopped advertising his divorce services during parts of March and April 1982. About April 27, 1982, respondent telephoned [C] and stated that he would meet him "head-to-head" and that he would "destroy" [C].

(14) On April 30, 1982, respondent placed ads in several publications, in which [C] advertised, under the name of "The Law Store of [respondent] — [A]."

(15) After [C] complained to the various publications about respondent's advertisements, respondent incorporated under the name of "The Law Store of [respondent] — [A] Inc." and began advertising under that name.

*Charge 3*

(16) Respondent and attorney [E], who were unassociated attorneys, advertised no-fault divorce services in publications in [R], [U], and [S], Pa.

(17) Respondent maintained an office only in [P], Pa, during the pertinent period.

(18) Attorney [E] maintained an office only in [F], Pa, during the pertinent period.

(19) Respondent advertised in the [F] Globe Times listing a telephone number in the [F] area. Calls placed in response to respondent's ad were automatically connected to respondent's [P] office or to a [T] number which was answered by an employee of respondent.

(20) About July 30, 1982, respondent telephoned [E] renewing his demands that [E] cease advertising and stating:

(a) "You don't know the juggernaut you are dealing with";

(b) "[A] and I play hardball" and "we will make sure you wished you hadn't taken us on."

(21) On August 9, 1982, respondent was granted a certificate of incorporation in the name of [F] Legal Clinic Inc., a name deceitfully similar to the trade name "[F] Legal Clinic" utilized by [E].

(22) On August 14, 1982, respondent ran an ad in the classified advertisement section of The [F] Globe Times stating "[F] Legal Clinic Inc., the original and only."

*Charge 4*

(23) On August 10, 1984, respondent and attorney [G] appeared in court in [　] County as opposing counsel on a domestic relations case.

(24) Upon leaving the courtroom, respondent stated to [G]: "Are you satisfied, slut?"

(25) [G] immediately kicked respondent and respondent reacted by kicking [G].

(26) Respondent threatened criminal prosecution against attorney [G] unless she paid him $1,000, but never filed such charges.

(27) Respondent repeated his threats on at least two occasions when they met privately.

(28) Respondent stated to attorney [G's] counsel, [N], that he would forego the $1,000 settlement if [G] would permit him to give her "one good swift kick" at a place on her body of his choosing.

(29) During a private meeting with [G], respondent stated to her that it was his strength to find another person's weak spot and attack it verbally and he found it more satisfying to hurt people this way than physically.

*Charge 5*

(30) About November 1981, respondent and his firm undertook to represent Mr. and Mrs. [H] in a bankruptcy action.

(31) About August 1984, as a result of respondent's legal services the [H] filed a malpractice action against respondent and his former associate.

(32) On September 4, 1984, respondent telephoned the [H] residence and speaking to Mrs. [H] called her a "slut whore who thinks she hooked a big fish in [H]" and "you and your hunky family probably fucked your way to anything you got" and that "you are no more than a whore shiksala."

(33) On the same date, respondent telephone Mr. [H] and stated as follows:

(a) "You are a jerk, a fucking disgrace to the Hebrew people, and a total failure in life because you filed for bankruptcy";

(b) "You married a no good whore shiksala because no Jewish girl would ever have a thing to do with you";

(c) "Your wife is a goyam bitch who probably waved her cunt at every man she could before finally settling for a failure like you";

(d) That respondent intended to do things to Mr. [H] and his family that would result in their "total destruction";

(e) That Mr. [H's] Judaism was "antiseptic" and "frivolous" and that respondent was engaging in a sort of "divine mission" seeking to destroy Mr. [H] and his family.

*Charge 6*

(34) In January 1985, respondent was counsel of record for plaintiff in a divorce action filed in [ ] County, Pa.

(35) On the same date, attorney [I] who represented defendant in the aforesaid divorce action telephoned respondent requesting that he voluntarily transfer the action from [ ] County to another county where she thought the venue was proper.

(36) After a dispute based on the difference of opinion on the law of venue, respondent told [I] to "be quiet and I'll teach you a thing or two."

(37) Respondent also told [I] that she was "smart ass," a "motor mouth," "reprehensible," an "idiot," and "a little girl."

(38) Respondent threatened [I] that he would imperil her relationship with her client, [J] Assistance Agency, by requesting hearings in each case and increasing costs and delays in these cases. -

*Charge 7*

(39) About June 1984, [K] hired respondent to represent her in a divorce action which she had commenced through respondent's partner prior to his suspension from practice.

(40) Respondent and [K] did not establish proper communications between them and [K] ultimately demanded the return of her file on February 5, 1985.

(41) Respondent told [K] that her file was closed and it would cost $150 to reopen and that she was a "lying little cheat," "no good and nothing but a liar," and "had no morals."

(42) When [K's] mother, [L], attempted to intercede for her daughter, respondent told her it was "none of her fucking business" and that she was "an old bitch," "an old bag," and "looney tunes." After the conversation with [L] was terminated, respondent repeatedly called back for approximately one hour thereafter hanging up as [K] each time transferred the phone to her mother.

(43) Respondent in conversation with [K's] fiance, [O], on February 11, 1985, again referred to [L] in derogatory tones such as "looney tunes."

(44) In the telephone conversation with [O] respondent stated to him that [O] was a "fuck face," that [K] was "dishonest," a "cheat," and "liar," and [L] was an "old fucking bitch."

## CONCLUSIONS OF LAW

The disciplinary board of the Supreme Court of Pennsylvania makes the following conclusions of law in this proceeding:

(1) Respondent has engaged in specific instances of knowingly misleading advertising in violation of DR 2-101(A) (dealing with a lawyer engaging in, utilizing or allowing any form of advertising that is knowingly false, fraudulent or misleading).

(2) Respondent has engaged in a course of conduct evidencing knowingly misleading advertising in violation of DR 2-101(A) (dealing with a lawyer engaging in, utilizing or allowing any form of advertising that is knowingly false, fraudulent or misleading).

(3) Respondent has engaged in conduct in violation of DR 1-102(A)(6) (dealing with conduct that adversely reflects on an attorney's fitness to practice law).

(4) Respondent has engaged in conduct in violation of DR 1-102(A)(4) (dealing with conduct involving dishonesty, fraud, deceit or misrepresentation).

(5) Respondent has engaged in conduct in violation of DR 2-102(A) (prohibiting a lawyer in private practice from practicing under a trade name or a

name that is misleading as to the identify of the lawyer or lawyers practicing under such name).

(6) Respondent has engaged in conduct in violation of DR 7-105(A) (prohibiting a lawyer from presenting, participating in presenting, or threatening to present criminal charges solely to obtain an advantage in a civil matter).

(7) Respondent has engaged in conduct in violation of DR 7-102(A)(1) (prohibiting a lawyer, in his representation of a client, from filing a suit, asserting a position, conducting a defense, delaying a trial, or taking other action on behalf of his client when he knows or it is obvious that such action would serve merely to harass or maliciously injure another).

(8) The allegations that respondent violated DR 6-101(A)(3) (dealing with neglect of a legal matter entrusted to an attorney) are dismissed.

## RECOMMENDATION

(1) The disciplinary board recommends to the Supreme Court of Pennsylvania that respondent, [ ], be suspended from the practice of law for a period of three years with said period of suspension to run consecutively to the period of suspension previously imposed by this court in the proceedings at no. 79 DB 82.

(2) Respondent shall pay all costs to the disciplinary board pursuant to rule 208(g) of the Pennsylvania Rules of Disciplinary Enforcement.

(3) The disciplinary board recommends that any future proceeding by respondent to become reinstated in the practice of law include significant inquiry as to whether the actions of respondent which resulted in this suspension were caused by his illness and whether he has recovered therefrom.

## ORDER

PER CURIAM. And now, this May 29, 1987, a rule having been issued by this court on March 6, 1987, to show cause why respondent should not be disbarred and, upon consideration of the response filed to said rule to show cause, the rule is hereby made absolute; and it is ordered that [respondent] be and he is disbarred from the bar of this commonwealth, and he shall comply with all the provisions of rule 217, Pa.R.D.E. It is further ordered that respondent shall pay costs to the disciplinary board pursuant to rule 208(g), Pa.R.D.E.

Mr. Chief Justice Nix and Mr. Justice Zappala dissent and would accept the recommendation of the disciplinary board.